1  **HARALSON, MILLER, PITT,**
   **FELDMAN & McANALLY, PLC**
2  Gerald Maltz – *pro haec* pending
   Peter T. Limperis – *pro haec* pending
3  One South Church Avenue, Suite 900
   Tucson, AZ  85701
4  Telephone:  520-792-3836
   Facsimile:  520-624-5080
5  Email:  gmaltz@hmpmlaw.com
          plimperis@hmpmlaw.com
6      -and-
   **KABATECK BROWN KELLNER LLP**
7  Brian S. Kabateck, SBN 152054
   Joshua H. Haffner, SBN 188652
8  Engine Company No. 28 Building
   644 South Figueroa Street
9  Los Angeles, CA 90017
   Telephone: 213-217-5000
10 Facsimile: 213-217-5010
   Email:  bsk@kbklawyers.com
11         jhh@kbklawyers.com
   *Attorneys for Plaintiff Bradley P. Miller*
12 *Derivatively on behalf of JP Morgan Chase & Co.*

13             **UNITED STATES DISTRICT COURT**

14             **EASTERN DISTRICT OF CALIFORNIA**

15
   BRADLEY P. MILLER, derivatively on behalf
16 of JPMORGAN CHASE & CO.,                          Case No. _____

17                    Plaintiff,                     **SHAREHOLDER'S**
                                                     **DERIVATIVE COMPLAINT**
18 v.

19 JAMES BELL; CRANDALL C. BOWLES;
   STEPHEN B. BURKE; JAMES S. CROWN;                 **JURY TRIAL DEMANDED**
20 JAMES "JAIME" DIMON; ELLEN V.
   FUTTER; WILLIAM B. HARRISON, JR.;
21 LABAN P. JACKSON, JR.; ROBERT I. LIPP;
   DAVID C. NOVAK; LEE R. RAYMOND; and
22 WILLIAM C. WELDON,

23                    Defendants,

24 -and-

25 JPMORGAN CHASE & CO.,

26                    Nominal Defendant.

# I.

## NATURE OF THE CASE

1.     This shareholder's derivative action arises out of Defendants' misconduct resulting in JPMorgan paying approximately $20 billion in regulatory fines and penalties to date and being subject to potential criminal liability. That calamity resulted from Defendants' acts and omissions in JPMorgan's sale of subprime residential mortgage-backed securities (RMBS) and from choosing to be Bernie Madoff's principal banker.

# II.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1332.

3.     Plaintiff is a citizen of Arizona and the defendants are citizens of other states and the amount in controversy exceeds the jurisdictional minimum for diversity jurisdiction.   JPMorgan is incorporated in Delaware with its principal place of business in New York.

4.     This Court has jurisdiction over the person of Defendants.

5.     Each Defendant has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.

6.     JPMorgan has substantial business operations in California, and a substantial portion of JP Morgan's mortgage lending operations is based out of and is conducted in California.

7.     Defendants were involved with or otherwise responsible for JPMorgan's policies and procedures in regards to the origination and securitization

1   of subprime mortgage loans, and the marketing and sale of subprime RMBS in
2   California.

3       8.    Venue is proper in this Court.

4       9.    Defendants caused substantial harm and injury in California as a
5   substantial portion of JPMorgan's shareholders are citizens of California.
6   Omissions giving rise to the claims alleged occurred in California. A criminal
7   investigation into the misconduct of JPMorgan in the origination, securitization,
8   marketing and sale of RMBS is being conducted in the Eastern District of
9   California by the United States Attorney for the Eastern District of California.

10       10.    On August 7, 2013, JPMorgan stated in its Form 10-Q filing that:
11   "The Firm is responding to parallel investigations being conducted by the Civil and
12   Criminal Divisions of the United States Attorney's Office for the Eastern District of
13   California relating to MBS offerings securitized and sold by the Firm and its
14   subsidiaries. In May 2013, the Firm received a notice from Civil Division stating
15   that it has preliminarily concluded that the Firm violated certain federal securities
16   laws in connection with its subprime and Alt-A residential MBS offerings during
17   2005 to 2007."

18       11.    On November 19, 2013, the Justice Department announced the
19   settlement of claims based on the investigation conducted by the U.S. Attorney in
20   Sacramento, as well as related investigations conducted by the California Attorney
21   General related to institutional purchasers in California.

22       12.    The action is not a collusive one to confer jurisdiction that the Court
23   would otherwise lack.

24

25

26

DERIVATIVE COMPLAINT                         Page 3

### III.

### PARTIES.

13.    PLAINTIFF has been a shareholder of JPMorgan stock since before 2004. He currently owns 121 shares.

14.    PLAINTIFF seeks to enforce rights that JPMorgan may properly assert against the Defendants but has failed to enforce.

15.    PLAINTIFF fairly and adequately represents the interests of similarly situated shareholders.

16.    JPMORGAN is a financial holding company involved in all aspects of the financial markets, including investment banking, asset management, private banking, and private wealth management.

17.    JAMES "JAMIE" DIMON is the current CEO, President and Chairman of the Board of JPMorgan. He has been JPMorgan's CEO and President since December 31, 2005 and Board Chairman since December 31, 2006. He has been a director of the company since 2004. Dimon has been President and Chief Operating Officer since JPMorgan's merger with Bank One Corporation in July 2004.

18.    JAMES A. BELL is a director of JPMorgan and has been one since 2011. Bell is a member of the JPMorgan Audit Committee.

19.    CRANDALL C. BOWLES is a director of JPMorgan and has been a director since 2006. Bowles is a member of the Audit Committee, Chairman of the Public Responsibility Committee and a member of the Board-level Executive Committee.

20.    STEPHEN "STEVE" B. BURKE is a director of JPMorgan and has been a director of JPMorgan since 2004. Burke is a member of the Compensation &

DERIVATIVE COMPLAINT                                Page 4

Management Development Committee and the Corporate Governance & Nominating Committee.

21.    JAMES "JIM" SCHINE CROWN is a director of JPMorgan and has been one since 2004.  Crown is Chairman of the Risk Policy Committee and a member of the Board-level Executive Committee. He also had been a director of JPMorgan Chase Bank, N.A., a wholly-owned subsidiary of JPMorgan since 2010.

22.    ELLEN FUTTER was a director of JPMorgan from 2001 through July, 2013, and a director of J.P. Morgan & Co. Incorporated from 1997 to 2000.  Futter served on JPMorgan's Risk Policy Committee in 2005, 2006, 2007 and 2008. Futter served as a director of JPMorgan during the relevant time period.  She retired from the Board of Directors in July 2013.

23.    WILLIAM B. HARRISON, JR. was a director of JPMorgan or one of its predecessor entities from 1991-2006.  After the 2004 merger of JPMorgan and Bank One, Harrison was named Chairman of the Board and Chief Executive Officer of the combined company, and former Bank One chief, Defendant Dimon, was named to be Harrison's successor.   Dimon replaced Harrison as Chief Executive Officer of JPMorgan in December 2005 and as Chairman of JPMorgan's Board in December 2006.

24.    LABAN P. JACKSON, JR is a director of JPMorgan and has been a director since 2004. Jackson is Chairman of the Audit Committee and a member of the Board-level Executive Committee.

25.    ROBERT I. LIPP was a director of JPMorgan from 2003 to 2008. Lipp became a Senior Advisor to JPMorgan in September 2005.

26.    DAVID C. NOVAK was a director of JPMorgan from 2001 through 2011.

DERIVATIVE COMPLAINT                                            Page 5

27.    LEE R. RAYMOND is a director of JPMorgan and has been one since 2001.  He served as a director of J.P. Morgan & Co. Incorporated from 1987 to 2000. Raymond is Chairman of the Compensation & Management Development Committee, member of the Corporate Governance & Nominating Committee and member of the Board-level Executive Committee.

28.    WILLIAM "BILL" C. WELDON is a director of JPMorgan and has been a director of JPMorgan since 2005. Weldon is a member of the Compensation & Management Development Committee, Chairman of the Corporate Governance & Nominating Committee and member of the Board-level Executive Committee.

29.    Defendants are sued as participants, co-conspirators, and as aiders and abettors in the wrongful conduct alleged.  At all relevant times, each Defendant was the agent of each other and acting within the course and scope of such agency in connection with the wrongful acts and omissions alleged.

30.    Each Defendant ratified and/or authorized the wrongful acts and omissions of each of the others.  The acts and omissions of the one were for the benefit of each and can be imputed as the acts and omissions of each.

31.    Demand on Defendants is futile.  They cannot fairly and adequately evaluate any demand made on the JPMorgan Board of Directors.  Defendants personally profited from the wrongdoing alleged in this Complaint.  Based upon the Defendants' acts and omissions in violation of their fiduciary duties of care, good faith, honesty and loyalty, a pre-suit demand on the JPMorgan Board of Directors to bring the claims asserted in this Complaint is excused as a futile.

32.    Plaintiff has not made any demand on JPMorgan's Board of Directors to investigate and prosecute the malfeasance alleged.  Such a demand is excused because making a demand would be a futile and useless act as the majority of JPMorgan's directors are not able to conduct an independent and objective

DERIVATIVE COMPLAINT                                                                Page 6

1    investigation of the alleged wrongdoing; and the wrongful conduct of defendants is
2    not subject to protection under the business judgment rule.

3        33.    Dimon faces likelihood of liability for his individual misconduct. He
4    has been named as a defendant in at least one federal class action in the Southern
5    District of New York alleging that he violated Section 10(b) of the Securities
6    Exchange Act of 1934 Act and Rule 10b-5 thereunder when he disseminated or
7    approved false statements regarding JPMorgan's business operations.   If Dimon
8    pursued this derivative action, it would expose his own repeated misconduct in
9    conducting the operations of JPMorgan.

10       34.    Dimon personally, benefitted from the alleged wrongdoing, and made
11   $134,147,916 from 2005 to 2012.  Since his compensation was determined by the
12   Compensation & Management Development Committee, he is also financially
13   beholden to that Committee and its members.   And is unable to fairly and
14   independently evaluate any claims against them. Dimon oversaw JPMorgan's shift
15   towards the origination, securitization, marketing and sale of subprime RMBS. He
16   also made misleading statements and concealed material facts regarding the extent
17   of JPMorgan's involvement in the subprime mortgage market.   He cannot
18   adequately and appropriately consider a demand.

19       35.    Bell also faces a likelihood of liability for his individual misconduct.
20   Bell was a director throughout the relevant time period and had a duty to ensure that
21   the Company's public filings with the SEC, press releases, and other public
22   statements on behalf of the Company were true and correct. Bell cannot adequately
23   and appropriately consider a demand.

24       36.    Bowles faces a likelihood of liability for her individual misconduct.
25   Bowles was a director throughout the relevant time period and had a duty to ensure
26   that the Company's public filings with the SEC, press releases, and other public

DERIVATIVE COMPLAINT                                                    Page 7

1    statements on behalf of the Company were true and correct.   Bowles cannot
2    adequately and appropriately consider a demand. Bowles is the Chairperson of
3    Springs Industries, Inc. and its subsidiaries have all benefited from extensions of
4    credit from JPMorgan.   Since Dimon, as CEO, has control over the credit lines of
5    Bowles's company, Bowles cannot render an independent judgment as to any
6    demand made on JPMorgan's Board of Directors.

7        37.    Burke faces a likelihood of liability from his individual misconduct.
8    Burke was a director throughout the relevant time period and had a duty to ensure
9    that the Company's public filings with the SEC, press releases, and other public
10   statements on behalf of the Company were true and correct. Burke faces a
11   substantial likelihood of liability.  He cannot adequately and appropriate consider a
12   demand.

13       38.    Crown faces a likelihood of liability for his individual misconduct.
14   Crown was a director throughout the relevant time period, and as such had a
15   fiduciary duty to ensure that the Company's public filings with the SEC, press
16   releases, and other public statements on behalf of the Company were true. Crown
17   faces a likelihood of liability.  Crown cannot adequately and appropriately consider
18   a demand.

19       39.    Jackson faces a likelihood of liability for his individual misconduct.
20   Jackson was a director throughout the relevant time period, and as such had a
21   fiduciary duty to ensure that the Company's public filings with the SEC, press
22   releases, and other public statements on behalf of the Company were true. Jackson
23   faces a likelihood of liability.    Jackson cannot adequately and appropriately
24   consider a demand.  Jackson also benefited from extensions of credit provided by
25   JPMorgan directly to him.   As CEO, Dimon is in a position to influence the
26   extension of credit, so Jackson is not independent of Dimon.

DERIVATIVE COMPLAINT                                                    Page 8

40.    Raymond faces a likelihood of liability for his individual misconduct. Raymond was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Raymond faces a substantial likelihood of liability.  Raymond cannot adequately and appropriately consider a demand.   Since 2001, Raymond has received $2,312,078 from JPMorgan, including about $245,000 each year in an annual base payment of cash and stock awards. To maintain his lucrative compensation, and ensure the value of his shares, Raymond had a continued personal financial interest in not disclosing Dimon's wrongdoing.  He is not able to fairly and appropriately consider any demand.

41.    Weldon faces a likelihood of liability for his individual misconduct. Weldon was a director throughout the relevant time period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Weldon faces a substantial likelihood of liability.   Weldon cannot adequately and appropriately consider a demand.  Weldon is on the Compensation & Management Development Committee  and  the  Corporate  Governance  and  Nominating Committee.  Weldon is responsible for determining the compensation awarded to officers, including Dimon. Weldon cannot fairly consider a demand.  He was involved in awarding huge compensation to Dimon.  Weldon was the CEO of Johnson & Johnson.  JPMorgan has provided credit to Johnson & Johnson and its subsidiaries. Dimon, as CEO, has control over the extension of credit. Weldon in not independent of Dimon or JPMorgan.

# IV.

## STATEMENT OF FACTS

### A.   RMBS

42.   JPMorgan originated subprime mortgage loans with apparently little concern for the ability of the borrowers to repay the mortgages.  It then packaged those bad loans into high risk, subprime RMBS, which it marketed and sold through fraud and the concealment of material facts.

43.   Defendants knowingly failed to implement policies or procedures sufficient to protect JPMorgan from engaging in misconduct in the subprime mortgage market and thus failed to discharge their fiduciary obligations to JPMorgan.   That included the failure to put in place an adequate process for reporting on JPMorgan's actions in the subprime mortgage market.

44.   Short-term, JPMorgan's reckless expansion into the JPMorgan inflated JPMorgan's profits, which inflated JPMorgan's stock price, and inflated the value of the JPMorgan stock owned by the Defendants.

45.   Defendants put their own short-term financial interests ahead of the long-term financial interests of the company resulting in billions of dollars of penalties and fines to the company.

46.   JPMorgan ignored and/or overrode its own underwriting standards in order to maximize loan origination, loaning hundreds of millions, if not billions of dollars, to subprime borrowers who had no documented history of repayment and were high risks for foreclosure.  JPMorgan engaged in this high risk lending in order to maximize loan volume.  It should have known the proverbial house of cards would someday collapse as it did.

47.   JPMorgan had claimed that the wrongdoing emanated from the businesses it had acquired, such as WaMu and Bear Stearns.  But Defendants knew

DERIVATIVE COMPLAINT                                                    Page 10

1   or should have known that JPMorgan itself was directly culpable for its own

2   misconduct in the subprime mortgage industry. JPMorgan's own direct involvement

3   in the subprime mortgage crisis was concealed and minimized until recently when it

4   was revealed that JPMorgan itself had been deeply involved in the fraudulent

5   marketing and sales of subprime RMBS.

6       48.   Because of their positions at JPMorgan, Defendants knew or should

7   have known that the mortgage loans JPMorgan was securitizing were with a high

8   risk of default. Defendants also knew that the securities the company was creating

9   and marketing were extremely risky. But it created the illusion that its securities

10  were creditworthy investments.

11      49.   Given JPMorgan's pervasive involvement in the subprime mortgage

12  industry, the Defendants could only have lacked knowledge of JPMorgan's

13  misconduct through their choice to ignore relevant information.

14      50.   Defendants in their roles as the officers and directors of JPMorgan

15  during the height of the subprime mortgage boom, put short-term profitability

16  above the substantial risk that JPMorgan would face billions of dollars in

17  settlements and fines, as well as potential civil and criminal liability, which would

18  impact JPMorgan's ability to conduct future business.

19      51.   Defendants as directors of JPMorgan were responsible for ensuring

20  that it was responsible and diligent in its business operations, including its

21  mortgage lending, mortgage securitization and securities marketing and sales

22  business.

23      52.   The importance of the subprime mortgage business to JPMorgan's

24  profitability made it particularly important that the Defendants implement policies

25  and procedures to ensure that JPMorgan conducted its business in a lawful and

26  prudent manner.

DERIVATIVE COMPLAINT                                              Page 11

1   53.   Defendants failed in that responsibility, by implementing policies and
2   creating a culture in which JPMorgan did not have adequate risk management
3   policies, or knowingly ignored those policies, in order to maximize profits from the
4   subprime mortgage loan and securitization business for the short term.

5   54.   Defendants breached their fiduciary duties by knowingly authorizing
6   and/or recklessly permitting JPMorgan to implement policies or ignore policies that
7   subjected JPMorgan to substantial financial risk as well as the risk of civil and
8   criminal penalties and fines. They also breached their fiduciary duties by failing to
9   put in place internal controls necessary to protect JPMorgan from engaging in the
10  misconduct set forth in this Complaint relating to its significant involvement in the
11  subprime RMBS crisis, thus knowingly failing to discharge their fiduciary
12  obligations to JPMorgan.

13  55.   Plaintiff's cause of action became known in November 2013 when the
14  harm suffered by the Defendants' misconduct was revealed through settlements
15  with institutional investors and a $13 billion settlement with the Justice
16  Department. It was not until August 7, 2013 that the public learned of criminal
17  investigations in this District, as well as the Government's conclusion that
18  JPMorgan itself (as opposed to WaMu and Bear Steams) had violated federal
19  securities laws in the sale of RMBSs.

20  56.   It was also on August 7, 2013 that the public learned that the criminal
21  investigation relating to JPMorgan's sale of RMBSs was being conducted out of the
22  Eastern District of California.

23  **B.   The London Whale**

24  57.   In July of 2012, the U.S. Senate Permanent Subcommittee on
25  Investigations initiated an investigation into the "massive bet" JPMorgan made on a
26  complex set of synthetic credit derivatives that ultimately resulted in the loss of at

DERIVATIVE COMPLAINT                                              Page 12

1   least $6.2 billion.  The "massive bet" arose out of JPMorgan's London offices, and
2   became known world-wide as the "London Whale" trades. According to U.S.
3   prosecutors, JPMorgan's committed securities fraud by hiding the true extent of
4   losses.  The effort to conceal the true nature of the gamble was found to extend all
5   the way up to Dimon, who initially was dismissive of the massive trade losses,
6   calling it a "tempest in a teapot."

7       58.    The Risk Policy Committee's failure to develop, implement, execute
8   and supervise a risk management program to protect against the "London Whale"
9   fiasco is a microcosm of the larger failure by JPMorgan, its entire Board of
10  Directors and the Risk Policy Committee to develop, implement, execute and
11  supervise a risk management program in the company.  Short-term profits were
12  earned by engaging in dangerous and improper business practices that exposed
13  JPMorgan to tens of billions of dollars in losses, and put JPMorgan's reputation and
14  ability to function as an American bank at risk.

15      59.    In March of 2013, the U.S. Subcommittee issued a report that placed
16  responsibility for the "London Whale" trading fiasco squarely on JPMorgan's
17  highest officers.  According to the Senate Report:

18      JPMorgan Chase's Chief Investment Office used its Synthetic Credit
19      Portfolio (SCP) to engage in high risk derivatives trading; mismarked
        the SCP book to hide hundreds of millions of dollars of losses;
20      disregarded multiple internal indicators of increasing risk; manipulated
21      models; dodged OCC oversight; and misinformed investors,
22      regulators, and the public about the nature of its risky derivatives
        trading. The Subcommittee's investigation has exposed not only high
23      risk activities and troubling misconduct at JPMorgan Chase, but also
24      broader, systemic problems related to the valuation, risk analysis,
25      disclosure, and oversight of synthetic credit derivatives held by U.S.
        financial institutions.
26

DERIVATIVE COMPLAINT                                              Page 13

60.     The   Report   also   identified   several   specific   and   material misrepresentations and omissions made by CEO Dimon to the press about the extent of JPMorgan's losses, and in JPMorgan's public filings with the SEC:

> [T]hese misstatements and omissions about the involvement of the bank's risk managers in putting on SCP [Synthetic Credit Portfolio] positions, the SCP's transparency to regulators, the long-term nature of its decision making, its VaR totals, its role as a risk-mitigating hedge, and its supposed consistency with the Volcker Rule, misinformed investors, regulators, and the public about the nature, activities, and riskiness of the CIO's credit derivatives during the first quarter of 2012.

61.     In the fall of 2013, JPMorgan reached agreements with U.S. and British regulators, including the Commodity Futures Trading Commission, pursuant to which JPMorgan admitted to committing securities violations and agreed to pay approximately $1 billion in penalties and fines as a result of the "London Whale" trade losses.

## C.     Energy Market Manipulation

62.     On November 14, 2012, the Federal Energy Regulatory Commission (FERC) suspended the electric market-based rate authority of JPMorgan Ventures Energy Corporation (JPMVEC), a wholly owned and controlled JPMorgan subsidiary, for submitting false information to the Commission. A FERC news release stated:

> [JPMorgan] made factual misrepresentations and omitted material information over the course of several months of communications with the California Independent System Operator (California ISO) and in filings to the Commission in connection with requests for information involving bidding activities in the California market.

1    63.    According to a July 2013 announcement, JPMorgan agreed to pay
2    $410 million to settle claims that it manipulated electricity prices. The amount
3    consisted of a $285 million civil penalty and the return of $125 million in allegedly
4    improper profits.

5    **D.    Credit Card Billing and Debt Collection Practices**

6    64.    On September 20, 2013, the Consumer Financial Protection Bureau
7    (CFPB) announced that JPMorgan agreed to pay refunds totaling $309 million to
8    more than 2.1 million credit card customers. In addition, the U.S. Office of the
9    Comptroller of Currency assessed a $60 million civil penalty against JPMorgan.
10   The joint investigation by the CFPB and the Office of the Comptroller resulted in a
11   September 19, 2013 Consent Order that "found that [JPMorgan] engaged in unfair
12   billing practices for certain credit card 'add-on products' by charging consumers for
13   credit monitoring services that they did not receive."

14   65.    On May 9, 2013, the California Attorney's General Office filed a
15   separate complaint against JPMorgan for its unlawful credit card debt collection
16   practices. According to the complaint, JPMorgan engaged in widespread "robo-
17   signing" of faulty affidavits in credit card collection lawsuits, and created a "debt
18   collection mill that abus[ed] the California judicial process" by "flood[ing]
19   California's courts with collection lawsuits against defaulted credit card borrowers
20   based on patently insufficient evidence."

21   66.    According to the California Attorney General, JPMorgan's practice of
22   filing bogus lawsuits against consumers was simply a "bet that borrowers would
23   lack the resources or legal sophistication to call [JPMorgan's] bluff." The unlawful
24   debt collection practices outlined in the California Attorney's General complaint are
25   reported to have occurred nationwide, and are currently under investigation by the
26   CFPB and the U.S. Office of the Comptroller of Currency.

DERIVATIVE COMPLAINT                                              Page 15

E.   **Overseas Hiring Practices**

67.   In August 2013, reports surfaced that the SEC is coordinating a civil investigation with federal prosecutors and the FBI about a JPMorgan hiring program, created in 2006, that allegedly offered to exchange employment in JPMorgan positions overseas for business. According to reports, JPMorgan offered over 250 high-ranking positions to sons and daughters of high-level Asian business partners and government officials in order to obtain lucrative business deals. The investigation is based on the Foreign Corrupt Practices Act of 1977, which bans United States companies from giving "anything of value" to a foreign official to win "an improper advantage" in retaining business.

68.   The Defendants received compensation from JPMorgan during the relevant time period, at the same time JPMorgan became highly exposed to liability through the origination, securitization, marketing and sale of subprime RMBS. Those short-sighted risky activities enabled Defendants to justify huge executive compensation packages. Therefore, Defendants had a personal self-interest not to implement or enforce adequate internal controls at JPMorgan which would have slowed down the company's lucrative RMBS sales. Short-term profits that exposed JPMorgan to substantial financial and regulatory risk and exposure.

69.   Dimon's highest compensation since becoming President and CEO of JPMorgan was in 2007, at the height of JPMorgan's wrongdoing. From 2005 through 2012, Dimon made approximately $134 million, $67 million of which he made from 2005 through 2007. The other Defendants also benefitted from the company's illegal conduct, and received generous compensation packages for their tenure on the Board and approval of Dimon's activities. At all relevant times, the Directors received both cash and stock-based compensation, and as a matter of Board policy, the most significant portion of director compensation was linked to

DERIVATIVE COMPLAINT                                                    Page 16

1   the Firm's common stock price.  Dimon was and is the sole member of the Board's

2   "Stock Committee."  As a Committee of one, Dimon has the authority to declare

3   dividends, authorize the issuance of stock within Board-approved limits, administer

4   the dividend reinvestment plan and implement share repurchase plans.

5       70.   Beginning by at least 2004, commercial banks, thrifts, and investment

6   banks (such as JPMorgan) were aggressively pushing into the market of

7   securitizing home loans in order to take advantage of Fannie Mae and Freddie

8   Mac's role in the mortgage loan securitization and investment process.  With the

9   promise of immediate, short-term profits and little to no long-term risks, mortgage

10   loan originators, of which JPMorgan was one of the largest, began to aggressively

11   increase their volume of home loans without regard to prospective borrowers'

12   creditworthiness.

13       71.   The Financial Crisis Inquiry Commission (FCIC) was created by the

14   Fraud Enforcement and Recovery Act of 2009, and was established to examine the

15   causes, domestic and global, of the current financial and economic crisis in the

16   United States.  It concluded in its January 2001 report, this new "originate-to-

17   distribute" or "originate-to-securitize" model "undermined responsibility and

18   accountability for the long-term viability of mortgages and mortgage-related

19   securities and contributed to the poor quality of mortgage loans."

20       72.   In the short term, the new "originate-to-distribute" or "originate-to-

21   securitize" model was highly profitable for the mortgage loan originators.  By

22   securitizing and then selling mortgage loans to investors, the mortgage loan

23   originators shifted loans and credit risk off their books, earned fees and were able to

24   issue more loans.  The mortgage loan originators pushed the risk of default and loss

25   onto the investors. The securitization process enabled the mortgage loan originators

26   to earn most of their income from transaction and loan-servicing fees, rather than as

DERIVATIVE COMPLAINT                             Page 17

1   in the traditional model from the spread between interest rates paid on deposits and
2   interest rates received on mortgage loans. This new model created a huge economic
3   incentive to originate more and more loans to feed into the "securitization
4   machine," an incentive that was not checked or controlled. JPMorgan eliminated or
5   ignored its internal controls because of the massive profits generated from the
6   "securitization machine."

7        73.    In testimony before the FCIC, the Chair of the Federal Deposit
8   Insurance Corporation (FDIC), explained both the misalignment of incentives
9   arising from the sale of loans and the misalignment created by flawed compensation
10  practices within the mortgage loan origination industry:

11        The standard compensation practice of mortgage brokers and bankers
12        was based on the volume of loans originated rather than the
13        performance and quality of the loans made. From the underwriters'
            perspective, it was not important that consumers be able to pay their
14        mortgages when interest rates reset, because it was assumed the loans
15        would be refinanced, generating more profit by ensuring a steady
16        stream of customers. The long-tail risk posed by these products did not
            affect mortgage brokers and bankers' incentives because these
17        mortgages were sold and securitized.

18        74.    Ben Bernanke, Chairman of the Federal Reserve Board, testified
19  before Congress that:
20
            When an originator sells a mortgage and its servicing rights, depending
21        on the terms of the sale, much or all of the risks are passed on to the
22        loan purchaser.   Thus, originators who sell loans may have less
            incentive to undertake careful underwriting than if they kept the loans.
23        Moreover, for some originators, fees tied to loan volume made loan
24        sales a higher priority than loan quality. This misalignment of
25        incentives, together with strong investor demand for securities with
26        high yields, contributed to the weakening of underwriting standards.

DERIVATIVE COMPLAINT                                          Page 18

75.    Riskier, more aggressive, mortgage products provided for the potential of higher yields for investors, but also correspondingly significantly increased the risk of default.  While these alternative mortgages generated massive amounts of interest on paper, it also greatly increased the risk of default by borrowers. According to a statement made in 2006 by the Center for Responsible Lending, "holding a subprime loan has become something of a high-stakes wager."

76.    This misalignment of incentives following the shift from the "originate-to-hold" model to the "originate-to-distribute" model caused JPMorgan, as a mortgage loan originator, to violate underwriting and appraisal standards. JPMorgan went so far as to accept, encourage and even fabricate information from loan applicants. Combined loan-to-value ratios – reflecting first, second, and even third mortgages – rose. Debt-to-income ratios climbed significantly, as did loans made for non-owner occupied properties.

77.    John C. Dugan, Acting Comptroller of the Currency, described for the FCIC the consequences of these poor underwriting practices:

> The combination of all the factors I have just described produced, on a nationwide scale, the worst underwritten mortgages in our history. When house prices finally stopped rising, borrowers could not refinance their way out of financial difficulty. And not long after, we began to see the record levels of delinquency, default, foreclosures, and declining house prices that have plagued the United States for the last two years-both directly and through the spillover effects to financial institutions, financial markets, and the real economy.

78.    Testifying before the Senate Committee of Banking, Alan Hummel, Chair of the Appraisal Institute's Government Relations Committee and Past President of the Appraisal Institute, stated that the dynamic between mortgage originators and appraisers created a "terrible conflict of interest" where appraisers

DERIVATIVE COMPLAINT                                                      Page 19

1  "experience[d] systemic problems with coercion" and were "ordered to doctor their
2  reports or else never see work from those parties again." Jim Amorin, President of
3  the Appraisal Institute, testified similarly before the House Financial Services
4  Committee, Subcommittee on Financial Institutions and Consumer Credit:

5    In recent years, many financial institutions have lost touch with
6    fundamental risk management practices, including the separation
     between loan production and risk management. Unfortunately, parties
7    with a vested interest in a transaction are often the same people
8    managing the appraisal process within many financial institutions: a
9    flagrant conflict of interest.

10     79.    Pressure was placed on appraisers to pump up the value of mortgage
11  loans to increase the size and quantity of mortgage loans being issued by mortgage
12  loan originators. A survey of 1,200 appraisers conducted by October Research
13  Corp. found that 90% of appraisers reported that mortgage brokers and others
14  pressured them to raise property valuations to enable deals to go through during the
15  relevant time period. The October Research Corp. study also found that 75% of
16  appraisers reported negative ramifications if they did not cooperate, alter their
17  appraisal, and provide a higher valuation, including being blackballed from doing
18  further appraisal business with other financial institutions.

19     80.    This widespread appraisal abuse resulted, in 2010, with the passage of
20  the Dodd-Frank Wall Street Reform and Consumer Protection Act, section 1472,
21  amended Chapter 2 of the Truth in Lending Act, 15 U.S.C. §§ 1631 *et seq.*, which
22  specifically prohibits actions that violate "appraisal independence. " All of the
23  abuses that were targeted by Congress were widespread during the time frame that
24  JPMorgan was a major player in the mortgage loan origination business and when it
25  securitized, issued and sold RMBS. These abuses caused the appraisals of the
26

1     collateralized real estate backing the RMBS being sold during the relevant time
2     period to be wholly unreliable.

3         81.     JPMorgan needed a steady stream of higher interest subprime loans in
4     order to drive the "securitization machine." That resulted in it engaging in
5     predatory lending practices. Scott Stem, the CEO of Lenders One, testified before
6     the Senate Banking Committee: "The truth is that many of us in the industry were
7     deeply distressed by the growing practice of pushing high risk loans on borrowers
8     who had no reasonable expectation of being able to repay the mortgage. Disclosures
9     were often less than adequate, and faced with a bewildering array of loan terms,
10     borrowers tended to trust their mortgage banker or broker . . . In our industry, we
11     have frankly seen too much mortgage malpractice."

12        82.     Chairman Bernanke similarly explained how mortgage loan originators
13     such as JPMorgan were engaging in predatory lending practices: "[a]lthough the
14     high rate of delinquency has a number of causes, it seems clear that unfair or
15     deceptive acts and practices by lenders resulted in the extension of many loans,
16     particularly high-cost loans that were inappropriate for or misled the borrower."
17     Mortgage loans were issued to "a borrower who ha[d] little or no ability to repay
18     the loan from sources other than the collateral pledged," a predatory practice
19     explicitly identified by the Expanded Guidance for Subprime Lending Programs
20     issued by the OCC, the Board of Governors of the Federal Reserve System
21     ("FRB"), the FDIC and the Office of Thrift Supervision ("OTS").

22        83.     FDIC Chairman Sheila C. Bair explained in testimony before the FCIC
23     that:

24         The well-publicized benefits associated with legitimate rate-reducing
            mortgage refinancing and rising housing prices conditioned consumers
25         to actively manage their mortgage debt. An unfortunate consequence
26         of this favorable environment for refinancing was fraud. Many

DERIVATIVE COMPLAINT                                  Page 21

consumers have only a limited ability to understand details of standard mortgage contracts let alone the complex mortgages that became common during this period. In this environment, unscrupulous mortgage providers capitalized on the widely advertised benefits associated with mortgage refinance, and took advantage of uninformed consumers by refinancing them into mortgage loans with predatory terms that were not readily transparent to many borrowers.

84.    The widespread departure by JPMorgan, as a mortgage loan originator, from prudent and conservative underwriting standards resulted in skyrocketing default and delinquency rates. High payment defaults and delinquency rates are reflective of a systematic disregard for underwriting guidelines by mortgage loan originators. When there is effective underwriting, poor credit risks are screened out and removed from the system. In the absence of effective underwriting, loans are made to unqualified borrowers and fraud is not detected. When money is lent to borrowers without regard to their ability to repay, loan delinquencies and foreclosures are highly likely.

85.    Studies have shown that the departure from sound and prudent underwriting practices and standards, which occurred during the explosion in securitizations, contributed to substantial increases in early payment defaults and delinquencies.   *See* Benjamin J. Keys et al., *Did Securitization Lead to Lax Screening? Evidence from Subprime Loans,* 125 Q. J. Econ. 307 (2010) ("[W]e show that a doubling of securitization volume is on average associated with about a 10%- 25% increase in defaults ...within two years of origination ... [and] a decline in screening standards ...").

86.    JPMorgan continued to be heavily involved in the origination, securitization, marketing and sale of RMBS from 2000 through 2007. It actively and aggressively increased its role and position in the RMBS market by

DERIVATIVE COMPLAINT                                                                   Page 22

1  dramatically increasing the volume of mortgage loans they purchased and
2  securitized. It publically touted its leading underwriter and market-maker role in
3  residential mortgages. Establishing a greater presence in the RMBS market was a
4  deliberate choice made by JPMorgan.

5      87.    In 2005, JPMorgan was underperforming the overall market compared
6  to other major financial institutions, including Bear Stearns, WaMu, Morgan
7  Stanley, and Goldman Sachs. That created pressure at JPMorgan to increase
8  revenues and profits as quickly as possible. The senior officers and directors of
9  JPMorgan, including the Defendants, were so eager to improve financial
10  performance that the internal controls and protocols put in place at JPMorgan for
11  ensuring that JPMorgan acted in a legal and appropriate manner were pushed aside,
12  ignored or minimized. This was done in order to boost profits short-term. Dimon
13  articulated JPMorgan's need to push profits at all costs in JPMorgan's 2005 Annual
14  Report.

15          We are underperforming financially in many areas. We need to
16          understand the reasons and focus our energy on making improvements,
        not excuses. We cannot afford to waste time justifying mediocrity.
17          Each line of business now assesses its performance in a rigorous and
18          very detailed way. Each compares results to targets in a variety of
19          areas, including sales force productivity, customer service and systems
        development.
20

21      88.    As a result, JPMorgan began to expand its high-risk loan origination
22  and securitization activities with a focus on "new product expansion initiatives."
23  All of these were euphemisms for JPMorgan's newly aggressive move into the
24  origination and securitization of subprime mortgages and the marketing and sale of
25  subprime RMBS through fraudulent means.
26

1       89.    On September 15, 2010, William Collins Buell VI, formerly of J.P.

2   Morgan securities, testified before the FCIC that there was pressure at JPMorgan to

3   compete with other firms involved in the mortgage-backed securities market.  This

4   pressure came from highest levels of JPMorgan, with senior executives and

5   JPMorgan's directors pushing the company to pump up profits, regardless of

6   whether that involved entering a high risk business area. Despite that risk, the

7   decision was made not to implement high levels of supervision and oversight, lest

8   such supervision and oversight prevent JPMorgan from boosting its profits to the

9   levels it could otherwise reach if allowed to operate in an unsupervised manner.

10       90.    Buell testified that JPMorgan and other investment banks believed that

11   there had "been a long period of stability, there [was] a great appetite for people

12   who want to borrow money, and there's a great appetite for investors and others

13   who want to employ their money.  And so there was a competition among a large

14   variety of participants in the market to try to expand the range of products that were

15   available." "[T]here was a very competitive process to offer a wider and wider array

16   of products to borrowers ...there was a tremendous amount of competition to try to

17   make products that people could actually get ... and that investors and lenders

18   would be interested in buying." Buell confirmed that this competition led to a

19   reduction in diligence and oversight on the part of JPMorgan.  Buell stated that

20   from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards

21   were "deteriorating," a fact that was known at all levels throughout JPMorgan.

22       91.    JPMorgan's 2006 Annual Report reassured investors that JPMorgan

23   had "materially tightened" its underwriting standards and would be "even more

24   conservative" in originating mortgages.  The 2006 Annual Report was signed by

25   Dimon.  Bowles, Burke, Crown, Futter, Jackson, Lipp, Novak, Raymond and

26   Weldon all signed JPMorgan's filing on Form 10-K for the fiscal year ended   2006

DERIVATIVE COMPLAINT                                            Page 24

1   which repeated the purportedly strong underwriting standards in place at JPMorgan

2   for mortgage loans. That filing concealed the fact that JPMorgan was not

3   complying with its underwriting standards in the origination of mortgage loans and

4   was becoming more aggressive in ignoring such standards in maximizing subprime

5   loan volume. It also concealed that JPMorgan was maximizing subprime loan

6   volume in order to maximize the number of high risk subprime RMBS that

7   JPMorgan could later create and then sell.

8       92.    JPMorgan purchased loans for securitization from financial institutions

9   and other secondary mortgage-market sellers. It purchased mortgage loans for

10   securitization through bulk and flow channels. "Bulk" acquisitions referred to

11   purchases of loans in bulk from large third-party originators. "Flow" acquisitions

12   referred to smaller-scale purchases of loans, typically on a loan-by-loan basis.

13   JPMorgan often facilitated the origination and purchase of loans through both the

14   bulk and flow channels by extending what was known as "warehouse" financing –

15   essentially a line of credit – to originators with whom JPMorgan had a relationship.

16   This was another mechanism by which JPMorgan inflated the volume of subprime

17   mortgage loans to increase the number and dollar size of RMBS that JPMorgan

18   could sell by misrepresenting the nature and risk characteristics of the RMBS and

19   the subprime mortgage loans underlying the RMBS.

20       93.    JPMorgan's residential mortgage "securitization machine" involved

21   numerous subsidiaries and/or sub-entities, including:   JPMorgan Acquisition;

22   JPMorgan Acceptance; JPMorgan Securities; JPMorgan Chase and JPMorgan

23   Bank; Chase Home Finance LLP; JPMorgan as Successor to WaMu Bank; and

24   JPMorgan as Successor to the Bear Stearns Companies, Inc.

25       94.    JPMorgan incentivized CHF, the mortgage loan origination arm of

26   JPMorgan, to pump out subprime mortgage loans to high risk borrowers, loosened

1   underwriting standards, and pressured appraisers to generate a large volume of
2   subprime mortgage loans with inflated dollar figures. These poor-quality mortgages
3   were then included into JPMorgan securitizations which were fraudulently
4   marketed to investors as high quality investments.

5       95.   Many of the reports of JPMorgan's deficient underwriting practices
6   come from JPMorgan's own employees and documents. Former regional vice-
7   president, James Theckston, was a recipient of the CHF "sales manager of the year"
8   award. He explained to the *New York Times* that 60% of his 2006 performance
9   review depended on him increasing the origination of high-risk loans.  A Banker
10  Speaks, With Regret, *New York Times,* Nov. 30, 2011.  In other words, it was built
11  into the system of JPMorgan to pump out subprime mortgage loans regardless of
12  the true creditworthiness of the borrower.

13      96.   Theckston also stated that CHF account executives could earn a
14  commission for the origination of subprime loans that was seven times higher than
15  for prime mortgages.   As a result of JPMorgan's incentive program, CHF account
16  executives intentionally looked for less savvy borrowers – those with less
17  education, without previous mortgage experience, or without fluent English – and
18  directed them toward subprime loans. According to Theckston, these borrowers
19  were disproportionately minority borrowers who, as a result of CHF practices,
20  ended up paying higher mortgage rates and were more likely to default and lose
21  their homes.  JPMorgan did not care about any of this, however, since the mere act
22  of lending the money was profitable, since the subprime mortgage loans were
23  packaged into subprime RMBS and then the risk sold off to others.

24      97.   In an undated JPMorgan internal memorandum, a JPMorgan employee
25  working in generating new RMBS circulated tips for using "Cheats & Tricks" to
26  allow JPMorgan mortgage loan originators to circumvent the in-house automated

DERIVATIVE COMPLAINT                                              Page 26

1   loan underwriting system to get risky loans approved. This memorandum states that
2   the secret to getting risky loans approved is to inflate the borrower's income or to
3   otherwise falsify their loan application.

4        98.   According to the memo, employees in JPMorgan's origination
5   department should "never fear" if they "do not get stated income / stated asset
6   findings" on the first attempt because they can try and try again until they get their
7   desired result.   For example, by lumping contingent income with base income,
8   concealing the receipt of gifts (which are typically required to be specifically
9   disclosed in loan applications), and artificially inflating income, JPMorgan loan
10  originators were able to approve countless loans that otherwise would not have
11  satisfied Zippy's stated underwriting guidelines.   The pervasive misuse of these
12  mechanisms by JPMorgan infected not only the risk characteristic of individual
13  mortgage loan borrowers, but also the risk characteristic of the JPMorgan RMBS
14  that were created using subprime mortgage loans.

15       99.   Government investigations into JPMorgan's unsound loan origination
16  practices have confirmed the existence of a prevailing attitude within JPMorgan of
17  using "cheats and tricks" to game the system and approve loans that are hot in
18  accordance with stated underwriting guidelines. These investigations also found
19  that: (1) JPMorgan employees faced intense pressure to close loans at any cost; (2)
20  JPMorgan employees manipulated loan data in order to close loans; (3) JPMorgan
21  approved loans based upon inflated appraisal values; and (4) JPMorgan failed to
22  adhere to sound underwriting guidelines.   This failure of internal control and the
23  lack of mechanisms to identify such problems demonstrate that the Defendants
24  knowingly failed to meet their fiduciary obligations to JPMorgan.

25       100.  A loan processor and assistant to the branch manager at a Florida
26  branch of CHF, who was at CHF from April 2006 until August 2007, stated that

DERIVATIVE COMPLAINT                                                   Page 27

CHF employees faced enormous pressure to close loans because their salaries were dependent solely upon quantity, not quality.  For example, loan officers only received a salary their first two months at CHF. After the second month, their income was based upon commissions for the number of loans they closed. If they did not close loans, they did not receive a paycheck. No incentive existed for CHF employees to ensure that the mortgage loans at issue were of good quality.

101. Underwriters at CHF received monthly bonuses based upon the volume of loans closed, and management pressured CHF underwriters to close loans.  Government investigations discovered that one regional manager would send the branch managers below him to CHF's underwriting office in New Jersey "to work the magic" and close the loans.

102. CHF employees have admitted approving loans based upon inflated appraisal values.  CHF employees were reportedly not allowed to contest appraisals that appeared to be inflated.  As a result of the housing bubble, appraisers over-adjusted and ensured that the appraisals came in at or above the sales price.

103. A senior underwriter at JPMorgan Chase Bank, N.A., who worked for JPMorgan from April 2001 to June 2008, stated that managers at JPMorgan Chase Bank, N.A. often overturned the decisions of lower-level underwriters to reject stated-income loans. This was consistent with the overall policy at JPMorgan to push through subprime mortgage loans at any cost. The complete absence of any mechanism for supervising JPMorgan's origination and securitization of subprime mortgage loans, as well as the sale and marketing of subprime RMBS, constitutes an abdication of the Defendants' responsibilities as JPMorgan officers and directors.

104. In a March 30, 2012 letter to shareholders, Dimon deflected blame away from himself and the other Defendants and blamed the subprime mortgage

DERIVATIVE COMPLAINT                                                  Page 28

crisis on "unscrupulous mortgage officers" who were "miss-selling mortgages" and on "some mortgage borrowers" who were "lying on mortgage documents." He wrote that "[w]e [JPMorgan] were one of the better actors in this situation- but not good enough; we made too many mistakes.  We generally were a better underwriter." He went on to write that "[m]any of our problems were inherited from Bear Steams and WaMu." But these systematic problems were not the result of the actions of a few low-level JPMorgan employees but rather the systemic breach of fiduciary duties owed by the Defendants, as senior officers and directors of JPMorgan.

105. Relying on poor underwriting, JPMorgan originated hundreds of millions if not billions of dollars' worth of mortgage loans that were destined to fail. Theckston, a former JPMorgan regional vice-president, stated to the *New York Times,* "[i]f you had some old bag lady walking down the street and she had a decent credit score, she got a loan." The *New York Times* noted that, when asked for a response to Theckston's account, JPMorgan "didn't deny the accounts of manic mortgage-writing ...and noted that Chase no longer writes subprime or no-document mortgages."

106. JPMorgan retained third-parties, including Clayton Holdings, Inc. Clayton Holdings, Inc. (Clayton) and The Bohan Group, Inc. (Bohan), to analyze the loans they were considering placing in their securitizations. On January 27, 2008, Clayton revealed to the public that it had entered into an agreement with the New York Attorney General (NYAG) to provide documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. The *New York Times* reported on January 27, 2008 that Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks

1   directed Clayton to halve the sample of loans it evaluated in each portfolio." The
2   documents that were released by Clayton show that JPMorgan was aware – on a
3   daily basis – of material weaknesses in the loan pools and in the underwriting
4   standards of the mortgage loan originators they used to support their RMBS
5   securitizations.

6       107. Clayton's "Trending Report" is evidence that JPMorgan and the
7   Directors knew the company was securitizing defective loans and selling the
8   resulting high-risk securities to investors. Beyond the high-risk nature of the
9   RMBS, however, were the misrepresentations made by JPMorgan to investors that
10  these RMBS investments were safe and low-risk.  On September 23, 2010,
11  Clayton's Vice President Vicki Beal testified that, through its numerous roles as
12  underwriter and sponsor, JPMorgan was made fully aware on a regular basis that a
13  significant percentage of its loans failed to meet stated underwriting guidelines, but
14  were being included anyway in the mortgage pools underlying residential mortgage
15  backed securities sold to investors.

16      108. The FCIC confirmed the accuracy of the Clayton report, finding that
17  during the period from the first quarter of 2006 to the second quarter of 2007, 27%
18  of the mortgage loans that JPMorgan submitted to Clayton to review for inclusion
19  in RMBS mortgage loan pools were rejected by Clayton as falling outside the
20  applicable underwriting guidelines.  Of the mortgage loans that Clayton found
21  defective, 51% were subsequently "waived in" by JPMorgan without proper
22  consideration and analysis of compensating factors and included in securitizations
23  per The Financial Crisis Inquiry Report, at 167, Jan. 2011, at http://fcic-
24  static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

25      109. A report generated as part of the New York Attorney General's
26  ongoing investigation of investment banking misconduct in underwriting mortgage-

DERIVATIVE COMPLAINT                                          Page 30

1  backed securities stated that Clayton routinely provided the banks with detailed
2  reports of loans that were not compliant with underwriting guidelines, but that the
3  banks, including JPMorgan, routinely ignored Clayton and other third-party due
4  diligence firms and overrode the exclusion of a significant percentage of rejected
5  loans from purchase and securitization.

6      110. In an April 15, 2008 report, the Federal Reserve of New York
7  concluded that JPMorgan needed to "strengthen [its] exposure measurement and
8  limit framework around leveraged lending." The Federal Reserve also reported that
9  JPMorgan's "deterioration in the quality of the firm's consumer portfolios" resulted
10  from "loosened underwriting standards" and "shortcomings in oversight and
11  controls governing third party mortgage loan origination activities," as well as
12  "breakdowns in the 'originate to distribute' model, namely weak underwriting
13  standards and investor concentration risk in collateralized loans obligations."

14      111. In January 13, 2010 testimony before the FCIC, Dimon confirmed
15  CHF's overreliance on third parties to originate loans, testifying that these broker-
16  loans performed markedly worse. With his testimony, however, Dimon chose not to
17  disclose that JPMorgan's problems were systemic and reached the highest levels of
18  the company, problems that would subject JPMorgan to criminal investigation and
19  billions in settlements.

20      112. JPMorgan, directly and through its various affiliates and subsidiaries,
21  participated in each step of the securitization process, from the origination and
22  servicing of the mortgage loans, to the sponsoring and structuring of the
23  securitization, to the underwriting and marketing of the certificates that represented
24  an investment in the RMBS. This integration at all levels of the process allowed
25  JPMorgan to control and manipulate the loan level documentation and the value at
26  which properties were appraised, and to ensure that loans would be approved by its

DERIVATIVE COMPLAINT                        Page 31

1   loan underwriters.  The purported use of third-party due diligence firms became
2   another part of the scheme since JPMorgan essentially ignored their work.

3       113.  JPMorgan encouraged its employees to ignore and manipulate
4   JPMorgan's automated underwriting system, called "ZiPPY." "Chase mortgage
5   memo pushes 'Cheats & Tricks,'" *The Oregonian* (March 27, 2008).  CHF went so
6   far as to explicitly instruct loan originators to falsify loan information in order to
7   elicit approval from the ZiPPY automated underwriting system for stated income
8   loans of poor quality.

9       114.  An article in *Bloomberg* on February 17, 2010 revealed that Dimon
10  was fully aware that its RMBS were of poor and deteriorating credit quality and
11  that he directed JPMorgan to shed the associated risk from JPMorgan's own balance
12  sheet.  The article reported that "[i]n October 2006, Mr. Dimon, JPMorgan's CEO,
13  told William A. King, its then head of securitized products, that [JPMorgan] needed
14  to start selling its subprime-mortgage positions."

15      115.  In 2008, *Fortune Magazine* reported on the same October 2006 phone
16  conversation, where Dimon allegedly instructed Mr. King to sell JPMorgan's
17  positions.  "I really want you to watch out for subprime! ... We need to sell a lot of
18  our positions.  I've seen it before.  This stuff could go up in smoke!"  By the end of
19  2006, JPMorgan had unloaded $12 billion in subprime assets that JPMorgan itself
20  had originated. Despite Dimon's view that JPMorgan's subprime holdings "could go
21  up in smoke!"

22      116.  On November 15, 2013, JPMorgan announced a $4.5 billion
23  settlement with 21 major institutional investors relating to RMBS trusts issued by
24  JPMorgan.  The following Tuesday, November 19, 2013, JPMorgan and the U.S.
25  Department of Justice separately announced a $13 billion settlement resolving
26  claims against JPMorgan by the Justice Department, several State Attorneys

DERIVATIVE COMPLAINT                                                    Page 32

1   General, the Federal Deposit Insurance Corporation, the National Credit Union

2   Administration and the Federal Housing Finance Agency relating to RMBS

3   activities by JPMorgan.

4      117. That same day, the California Attorney General, Kamala Harris,

5   announced that JPMorgan will pay $298,973,000 of that total to California, based

6   on JPMorgan's misrepresentations in RMBS sold to California's public employee

7   and teacher pension funds, CalPERS and CalSTRS, between 2004 and 2008. The

8   total agreement, reached after an extensive investigation conducted by the

9   Sacramento U.S. Attorney's office, is the largest settlement ever between the

10   government and a U.S. company. JPMorgan also acknowledged that the criminal

11   investigation conducted by the same office was not resolved.

12      118. As part of the settlement, JPMorgan also admitted to a Statement of

13   Facts that outlined how it failed to disclose risks of buying RMBS from 2005 to

14   2008. JPMorgan acknowledged that it told investors the mortgage loans in

15   securities it packaged and sold complied with underwriting guidelines, while bank

16   employees knew – and reported to bank "Managing Directors" in due diligence,

17   trading and sales – that, in a number of instances, the loans in question did not.

18      119. Before those announcements, there was no publicly-available

19   information indicating that JPMorgan's misconduct in the subprime mortgage

20   industry may have risen to the level of criminal misconduct or that JPMorgan or its

21   employees faced the prospect of criminal prosecution. The size of JPMorgan's

22   settlement with the Justice Department, $13 billion, reveals the true extent and

23   seriousness of the misconduct by JPMorgan and that evidence establishing such

24   misconduct is substantial.

25

26

DERIVATIVE COMPLAINT                                                          Page 33

**F.   Bernie Madoff's Banker**

120.   On January 7, 2014, the *New York Times* reported that JPMorgan was fined $2 billion as a result of its involvement in Bernie Madoff's Ponzi scheme. The United States Attorney for the Southern District of New York imposed a $1.7 billion penalty stemming from two felony violations of the Bank Secrecy Act, a federal law that requires banks to alert authorities to suspicious activity. JPMorgan also agreed to pay $350 million to the office of the Comptroller of the Currency.

121.   The same *New York Times* report states that JPMorgan was Madoff's "primary bank for more than two decades" and that prosecutors argued that the Madoff Ponzi scheme was conducted almost exclusively through various accounts held at JPMorgan. "JPMorgan had a unique window into his scheme." The U.S. Attorney drew a direct line between Madoff's fraud and JPMorgan's failings, citing JPMorgan for "repeatedly ignoring warning signs." "In part because of that failure, for decades Bernie Madoff was able to launder billions of dollars in Ponzi proceeds."

122.   In the January 8, 2014 issue of the *Wall Street Journal*, in an article "JPMorgan Settles its Madoff Tab," the U.S. Attorney for the Southern District of New York is quoted as follows:

> U.S. Attorney Preet Bharara, who conducted his investigation with the Federal Bureau of Investigation, said at a news conference that J.P. Morgan "failed miserably" as an institution and repeatedly ignored warnings about Mr. Madoff despite "plenty of reasons to be uniquely suspicious."

123.   Similarly, the *Financial Times* on January 8 reported:

> Its $1.7 billion payment to the Department of Justice is "the largest-ever bank forfeiture," according to the office of Preet Bharara, U.S.

DERIVATIVE COMPLAINT                                                     Page 34

Attorney for the Southern District of New York. "JPMorgan as an institution failed – and failed miserably," said Mr. Bharara.

## V.

## CLAIMS

### Breach of Fiduciary Duty

124. At all material times, the directors of JPMorgan owed and owe the company a fiduciary duty of care and a duty of loyalty to the company.

125. The duty of care includes a duty by each director of JPMorgan to inform himself or herself, prior to making a business decision, of all material information available to the director and to consider all alternatives.

126. The importance of the RMBS business to JPMorgan, and the fact that it was built primarily on subprime mortgages, placed upon the directors an obligation to ensure that appropriate policies and procedures were in place and being followed.

127. The directors had the responsibility to ensure that appropriate information and reporting systems were in place, especially regarding the risks and legal ramifications of the subprime mortgage loan origination, securitization and sales business. The failure of the directors to implement such procedures and policies and the failure of the JPMorgan directors to exercise due diligence and care in the performance of their responsibilities constituted breaches of their fiduciary duties to the company and its shareholders.

128. Defendants who are also officers of JPMorgan also had a fiduciary duty to ensure that JPMorgan conducted itself in a lawful manner and that internal controls, policies and procedures were in place to prevent the company from engaging in illegal and fraudulent conduct, irrespective of whatever short-term gains could be obtained from such misconduct.

DERIVATIVE COMPLAINT                                                     Page 35

1      129.  The Defendants put their own interests ahead of that of the company
2  and its other shareholders.  For example, the decision to aggressively push forward
3  into the subprime mortgage loan origination and securitization business without
4  adequate safeguards, policies and procedures was made because it increased the
5  personal profits of the Defendants, while putting JPMorgan at substantial risk and
6  exposing JPMorgan to inevitable enormous civil penalties, fines and settlements,
7  and potential criminal exposure.  Defendants violated their duty of loyalty to
8  JPMorgan.

9      130.  By virtue of the facts alleged in this Complaint, the Defendants
10  breached their fiduciary duties to JPMorgan and the company has been damaged as
11  a result.

12                        **Waste**

13      131.  By virtue of the facts alleged in this Complaint, the Defendants also
14  wasted JPMorgan's corporate assets by paying or approving the payment of
15  executive and/or director compensation based on the illegal conduct described.  As
16  a result of the Defendants' wrongful conduct, JPMorgan has suffered and continues
17  to suffer economic losses and non-economic losses, all in an amount to be
18  determined according to proof at trial.

19                  **Unjust Enrichment**

20      132.  The Defendants derived compensation, fees and other benefits from
21  JPMorgan and were otherwise unjustly enriched from their management of
22  JPMorgan during the time in which the wrongful practices occurred, to the
23  detriment of JPMorgan.  Defendants profited by engaging in the wrongful conduct
24  set forth above.  Those benefits should not be held or retained by the Defendants
25  and should be disgorged back to the company.

26

DERIVATIVE COMPLAINT                                   Page 36

1    133.   The Defendants' enrichment is directly and causally related to the

2  detriment of JPMorgan.   These benefits were accepted by the Defendants under

3  such circumstances that it would be inequitable for them to be retained without

4  payment.  Defendants should be required to make restitution to JPMorgan.

5    134.   Breach of fiduciary duty is constructive fraud.

6    135.   Willful ignorance is intentional or reckless conduct within applicable

7  standards for the imposition of punitive damages.

8    136.   Defendants' misconduct meets applicable standards for the imposition

9  of punitive damages.

10    137.   Plaintiff lacks an adequate remedy at law to the extent that equitable

11  relief is requested.

12                            **REQUEST FOR RELIEF**

13    Plaintiff, derivatively on behalf of JPMorgan, requests judgment as follows:

14    1.   Awarding compensatory damages against all Defendants, jointly and

15  severally, in amounts to be proven at trial;

16    2.   Awarding a preliminary and/or permanent injunction precluding

17  JPMorgan and its Board of Directors from continuing to operate JPMorgan without

18  internal controls for managing and overseeing JPMorgan's RMBS operations;

19    3.   Awarding any additional appropriate equitable relief, including

20  injunctive and/or declaratory relief necessary to change and/or reform JPMorgan's

21  corporate governance, policies and culture;

22    4.   Awarding restitution, disgorgement of all illicit proceeds generated as

23  a result of the wrongful conduct alleged;

24    5.   Awarding punitive damages against all defendants, jointly and

25  severally, in amounts to be proven at trial;

26

DERIVATIVE COMPLAINT                                              Page 37

1      6.    Awarding pre-judgment interest, as well as reasonable attorneys' fees

2  and other costs and expenses; and

3      7.    Awarding such other relief as is just and proper.

**HARALSON, MILLER, PITT,**
**FELDMAN & McANALLY, PLC**

By _____

Gerald Maltz
Peter T. Limperis

**KABATECK BROWN KELLNER LLP**

By _____

Brian S. Kabateck
Josh H. Haffner

Attorneys for Plaintiff

## VERIFICATION

Bradley P. Miller, declares under penalty of perjury:

I am the plaintiff in this action. I am a shareholder of JPMorgan Chase & Co. and have been since before 2004. I have read the foregoing Complaint and authorize its filing. Based upon my counsel's and my investigations, the contents thereof are true to the best of my knowledge, information and belief.

Dated: January 21, 2014
Tucson, Arizona

_____
Bradley P. Miller

DERIVATIVE COMPLAINT                             Page 38